**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| JOSHUA M. COOKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10-cv-00256-JAW |
| | ) | |
| COMMISIONER, MAINE | ) | |
| DEPARTMENT OF CORRECTIONS | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a motion for summary judgment. Joshua Cookson, an

inmate at the Maine State Prison (MSP), is pursuing a civil action asserting that his rights under

the First Amendment free exercise and establishment clauses and the Religious Land Use and

Institutionalized Persons Act (RLUIPA) have been violated. He also claims a Fourteenth

Amendment equal protection violation.[1] Cookson practices 'Satanism' and describes this as his

religion. He complains that he is forbidden from observing his religion because of restrictions

placed on the practice by the former Commissioner of the Maine Department of Corrections

(MDOC), Martin Magnusson. Magnusson has provided the court with a straightforward

statement of facts which includes a history of a prior complaint about the prison's policy

addressed by Magnuson and a narrative of how Magnusson approached Cookson's particular

request. Magnusson left his position in February 2011, and a new Commissioner, Joseph Ponte,

was appointed.

---

[1] Actually, Cookson's complaint does not specify what claims he is bringing to the federal forum. (See Compl. at 3.) In his appeal of the denial of his grievance to the Commissioner, Cookson does indicate that the policies and decisions at the MSP infringe his free exercise of religion right, his right to free speech, and his right to due process and/or equal protection of the law. (Doc. No.1-2 at 7-8.)

In responding to the motion for summary judgment Cookson explains:

> There are primarily only two issues. One, as to whether Satanism is a religion for the purposes of First and Fourteenth Amendments of the U.S. Constitution and the [RLUIPA] protections. Two, as to whether [] the plaintiff's rights under [these amendments and the statute] were violated or [are] being violated currently because he is prevented from engaging in group study, practice, and rituals.

(Pl.'s Opp'n Mot. Summ. J. at 4, Doc. No. 16.)

I entered a recommended decision on the motion for summary judgment on July 26, 2011. Because Magnusson was no longer the Commissioner and was unable to deliver the prospective relief requested by Cookson, I recommended judgment in favor of Magnusson. However, I noted: "If Cookson seeks to pursue an official capacity claim against the new commissioner, seeking only prospective injunctive relief, and if the new commissioner is satisfied with the prior disposition of the third level grievance, entry of final judgment could be delayed by a motion for substitution of parties in order to obtain a ruling on the merits in the context of the current summary judgment record." (Doc. No. 23 at 1-2.) In due course the State filed a motion to substitute party and a motion to extend the time to supplement the summary judgment record. (Doc. No. 25.) The State requested the extension so that Commissioner Ponte could review Cookson's Level III grievance and make an independent decision of the merits of the grievance. (Id. at 1.) It also suggested that Ponte might file an affidavit supplementing the summary judgment record. (Id.) Cookson filed a motion to amend his complaint to substitute Commissioner Ponte in his official capacity. (Doc. No. 26 at 1 -2.)

I granted the motions to substitute parties, the motion to extend time, and the motion to amend. (Doc. No. 28.) Subsequently, I withdrew my recommended decision, explaining:

> In accordance with both parties wishes Martin Magnusson has been terminated as the Commissioner of record and the current commissioner has been substituted.

The defendant has 45 days to amend/modify its motion for summary judgment in order to conform with the current state of the record, following the new commissioner's review of the plaintiff's grievances. The plaintiff will then have the normal response time regarding any modification to the summary judgment record, and a normal reply will follow. Neither party need resubmit any prior filings and the record on the current motion for summary judgment will be incorporated into whatever modifications are submitted.

(Doc. No. 29.)

Ponte filed an amended motion for summary judgment on October 6, 2011. (Doc. No. 30.) The motion, accompanied by an affidavit, indicates that Ponte agrees with "the decision reached by former Commissioner Magnusson denying plaintiff's request to practice Satanism at the state prison and adopts the grounds asserted by former Commissioner Magnusson for that decision." (Doc. No. 30 at 1.) Cookson has filed a memorandum opposing the amended motion for summary judgment (Doc. No. 30) to which he attaches the defendant's responses to his two sets of interrogatories (Doc. Nos. 31-2, 31-3) and an article about what you should do if you are left on earth after the Rapture. (Doc. No. 31-3.) The Commissioner has filed a reply to Cookson's opposition to the amended motion for summary judgment, arguing that there is "no reasonable accommodation possible" vis-à-vis the practice of Satanism at MSP because of the "violent nature of the central tenants of Satanism." (Doc. No. 32.)

I recommend that the Court grant the motion for summary judgment.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a

trialworthy issue exists." <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995) (citing <u>National Amusement Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995)).

## A. Facts[2]

### 1. The Commissioner's Facts

Martin Magnusson was the Commissioner of the Maine Department of Corrections from May 1997 until February 2011. (SMF ¶ 1.) In this position, Magnusson generally oversaw the management and control of the correctional facilities, detention facilities, and correctional programs in the state of Maine, including the Maine State Prison. (SMF ¶ 2.) In his position as Commissioner, pursuant to 34-A M.R.S.A. § 3048, Magnusson was mandated to adopt rules to accommodate prisoners in the state correctional facilities who expressed a wish to practice a particular religion, as long as the practice did not "present a threat to the safety, security or orderly management of the facility in which the prisoner [was] housed." (SMF ¶ 3.)

In accordance with this mandate, Magnusson adopted Policy Number 24.3, effective February 15, 2009, entitled, "Religious Services, General Guidelines." (SMF ¶ 4.) Pursuant to Policy Number 24.3, an inmate may request a religious practice not currently allowed within a facility by submitting a written letter to the Chaplain or other designee who would forward the request to the Chief Administrative Officer of the facility, or his or her designee, to make a decision. (SMF ¶ 5.) Policy Number 24.3 specifies that inmates will be provided the opportunity to participate in religious practices, "where feasible and not contrary to safety, security, or orderly management of the facility…." (SMF ¶ 6.) Policy Number 24.3 does not

---

[2]  With some exceptions I have set out the two side's facts in two different sections rather than blending them. This is because Cookson's responsive statement of fact and his 100-paragraph declaration that he adopts as his statement of additional facts overlap to a large extent and are more legal argument and his belief than substantiated fact with record citation. Many of the defendant's objections to the declaration/statement of fact are credible but I have nevertheless tried to include the substance of Cookson's declaration when setting forth his "facts."

prohibit an inmate's belief in a particular faith, religion, or purported religion, nor does any other policy of the Department of Corrections.  (SMF ¶ 7.)  Magnusson additionally adopted Policy Number 21. 2, effective August 4, 2003, entitled "Prisoner Mail."  (SMF ¶ 8.)  Policy Number 21.2, Procedure E (2)(g) specifically prohibits, "[p]ublications and other materials . . . sent to prisoners . . . if they contain . . . material that promotes, hate, violence or bias."  (SMF ¶ 7.)  Cookson entered the Maine State Prison on September 25, 2000, and is currently an inmate there.  (SMF ¶ 11.)  As of July 17, 2009, Cookson had been a "devout Satanist for the past couple of years."  (SMF ¶ 12.)  As of April 11, 2009, Cookson, as a Satanist "had a daily practice for over 2 years" at the Maine State Prison.  (SMF ¶ 13.)

On June 1, 2009, Cookson filed a grievance after his request for space in the Activities Building to practice Satanism was denied.  (SMF ¶ 14.)  Cookson was requesting that Satanism be recognized as a religion within the Maine State Prison in order to practice Satanic religious services.  (SMF ¶ 15.)  Cookson's first and second level grievance appeals were denied.  (SMF ¶ 16.)  In July 2009, Magnusson received a third level grievance appeal related to these policies from Cookson while Cookson was incarcerated at the Maine State Prison.  (SMF ¶ 10.)  Magnusson handled the third level grievance appeal and reviewed the first and second level decisions denying Cookson's request to recognize Satanism at the Maine State Prison and denying his request for space to facilitate the religious practice of Satanism.  (SMF ¶ 17.)  From Magnusson's review of the grievance record, it appeared that Cookson was requesting space in the Activities Room in order to perform Satanic group religious services.  (SMF ¶ 18.)  Magnusson had previously dealt with this issue in a grievance filed by several inmates at the Maine State Prison requesting accommodations for the practice of Satanism in 2002.  (SMF ¶

19.)  In addressing Cookson's case, Magnusson relied on his third level grievance decision in this previous case.  (SMF ¶ 20.)

In reviewing whether to allow the group practice of Satanism at the prison in 2002, Magnusson consulted the Office of the Attorney General and investigated the nature of the practice of Satanism.  (SMF ¶ 21.)  In that case, the inmates submitted a proposal detailing some of the tenets and practices of Satanism which Magnusson reviewed.  (SMF ¶ 22.)  The proposal iterated "The Nine Satanic Statements" which included:  "Satan represents vengeance, instead of turn the other cheek!"; and, "Satan represents all of the so-called sins, as they all lead to physical, mental, or emotional gratification!"  (SMF ¶ 23.)  The proposal also stated "The Eleven Satanic Rules of the Earth" which included:  "If a guest in your lair annoys you, treat him cruelly and without mercy"; and "If someone bothers you, ask him to stop.  If he does not stop, destroy him." (SMF ¶ 24.)  In the course of his investigation of this grievance, Magnusson was also advised of portions of the primary text of Satanism, The Satanic Bible.  (SMF ¶ 25.)  Magnusson learned that portions of the text encouraged hate for your "adversary" to be shown by extreme violence; and also promoted gratification by the so-called deadly sins.  (SMF ¶ 26.)  Magnusson also became aware during his investigation that some Satanic rituals were specifically aimed at other people.  (SMF ¶ 27.)

On September 27, 2002, after completing the investigation and upon advice of the Office of the Attorney General, which had reviewed legal precedent, Magnusson denied the inmates' request to practice Satanism at the Maine State Prison.  (SMF ¶ 27.)  The decision Magnusson made in the 2002 grievance was based solely on the determination that the practices and principles involved in Satanism created a risk to the safety and security of the prison.  (SMF ¶ 28.)  Specifically, Magnusson found the following:

> a. the principle of vengeance espoused by Satanism created a risk to safety and security in the prison;
>
> b. Satanic rituals aimed at other people could easily be used to prey on the vulnerable and therefore created a risk to safety and security in the prison;
>
> c. the encouragement of followers of Satanism to show hatred of adversaries through the use of extreme violence created a risk to safety and security in the prison; and
>
> d. Satanism created a risk to safety and security in the prison by promoting followers to seek gratification by all of the so-called deadly sins.

(SMF ¶ 30.)

For the same reasons, on September 1, 2009, Magnusson denied Cookson's request to practice Satanism at the prison as, "Satanic materials and the practice of Satanism are a threat to the safety, security, and the orderly management of the facility." (SMF ¶ 31.) Magnusson believed his decision was in accordance with federal law and the Department of Corrections' own policy and that he was justified in denying Cookson's grievance appeal. (SMF ¶ 32.)

With respect to the facts outlining Magnusson's reasons for denying Cookson's appeal (SMF ¶¶ 19 through 32), Cookson insists that these statements should be stricken because Cookson was not made aware of these facts during the grievance process (Resp. SAMF ¶¶ 19 through 32).

2. ***Cookson's Facts***

a. ***Substantive facts***

Cookson is expressly not challenging the policy governing the treatment of his request to practice his 'religion' but rather the application of that policy to Cookson. For instance, in Paragraph 61 of his declaration Cookson refers to his second level grievance: "I was very clear in stating that Satanism 'could be practiced in this facility <u>without violating any of the rules or guidelines of the Facility</u>- just like the other recognized religions here.' " (Cookson Decl. ¶ 61)(emphasis added). (<u>See</u> <u>also</u> <u>id.</u> ¶¶ 16, 17, 18, 19, 20, 22, 23, 24, 25).

The commissioner shall adopt rules that provide for the accommodation of any prisoner who expresses a desire to practice a religion of the prisoner's choice as long as the practice does not present a threat to the safety, security or orderly management of the facility in which the prisoner is housed. The rules must be consistent with all federal requirements.

34-A M.R.S. § 3048. (See Cookson Decl. ¶ 21.) MDOC policy number 24.03 provides:

The department shall accommodate any prisoner who expresses a desire to practice a religion of their choice provided this does not present a threat to safety, security, or orderly management of the facility. In addition, the department may not place a substantial burden on a prisoner's practice of religion, regardless of whether a particular practice is considered essential, except in furtherance of a compelling state interest, such as safety, security, or orderly management of the facility, and only by the least restrictive means available.

(Doc. No. 13-1 at 1; Cookson Decl. ¶ 27.) It also states:

The religious service program shall provide prisoners, when feasible and not contrary to safety, security, or orderly management of the facility, with the opportunity to participate in group religious ceremonies, individual religious counseling, religious study classes, observance of recognized dietary restrictions and other allowable religious items, religious holy day arrangements and special religious programming provided by approved faith group volunteers from the community. Each facility shall have space and equipment for the provision of the religious services program.

(Doc. No. 13-1 at 3; Cookson Decl. ¶¶ 28.)[3]

Cookson's declaration provides an explication of his personal beliefs regarding Satanism.

He sets forth the following tenets regarding his personal brand of Satanism and how it must be practiced:

- Cookson is a Satanist and he sincerely believes that Satanism is a religion. He is not a member of the Church of Satan or any particular sect or splinter group at that church. (Cookson Decl. ¶¶ 35, 36.) Cookson sincerely believes that as a Satanist, he is not required to follow any particular church teaching or dogma. (Id. ¶ 36.)

---

[3] Cookson also sets forth other policies related to, for example, the scheduling of group religious and non-religious services and has filed an example calendar of these meetings. (Doc. No. 17-1.)

- Cookson does not adhere to the teachings of Anton LaVey[4] and his Satanic Bible. (Id. ¶ 37.)
- Cookson sincerely believes that Satanism answers fundamental questions about life, death, purpose, and the overall conception of the universe. (Id. ¶ 38.)
- He sincerely believes in using only nonviolent practices and rituals of Satanism and that no aspect of his religious practice requires him to jeopardize the safety and security of staff members or inmates or violate the constitutional or statutory rights of other inmates or staff of any institution. (Id. ¶¶ 39, 40, 41.)
- Cookson believes that his religious practice and teachings promote personal growth and development, and teaches tolerance, respect, and understanding for the rights and beliefs of others. (Id. ¶ 42.)
- Cookson educated himself on the topic of Satanism prior to coming to MSP and while at MSP by reading books and other literature from experts and Satanic practitioners. (Id. ¶ 43.)
- Cookson began practicing Satanism over four years ago, and his sincerely held beliefs are influenced, among other things by a non-exhaustive list of five publications. (Id. ¶ 44.)[5]
- He believes that performing ritual and ceremony is one of the fundamental parts of his religious beliefs and are needed for drawing the necessary spiritual energy to himself for the purpose of cultivating his immortal substance. (Id. ¶¶ 45, 46.) These ceremonies and rituals do not include violence, rape, human or animal sacrifices, or any practice that would make Cookson violate MDOC disciplinary policies or procedures. (Id. at 47.)
- Cookson sets forth the basic format of his religious ceremonies and rituals:
  o Establish the boundaries of a sacred space within a room by casting a circle around the room.
  o Banishing of unwanted influences and energies by carrying burning incense and burning candles around the room while chanting sacred prayers. The incense and candle also act as a source of energy for participants in the ritual and helps get them out of the "everyday" state of mind and into a spiritually focused state.
  o After the circle and banishment are completed, the body of the ritual is performed, which would include chantings, audible or silent prayers, mediation, bell ringing, and clapping. (Id. ¶ 48 (a), (b), (c).)

---

[4]     The Satanic Church in America was founded in 1966 by Anton Tszander LaVey. 2 J.G. Melton, <u>The Encyclopedia of American Religions</u> 302-03 (1978).

[5]     There is no reason to list the five publications because the titles of these publications are not material to the resolution of this motion for summary judgment.

- A separate room is required because religious ceremonies cannot be performed in the housing areas according to the rules of the prison, incense and candles cannot be burned in housing areas or in the cells, and inmates live in different housing areas and they need a scheduled time and place to meet to discuss and learn about Satanism and practicing group rituals and ceremonies. (Id. ¶¶ 49, 50, 51.)
- These rituals and ceremonies are: "the highest art of conscious elevation; it is the evolution of the spirit and the self, the very path of mediation between us and our Gods." (Id. ¶ 52)(quoting Ford, Michael, <u>Luciferian Witchcraft</u>).
- In most Satanic texts and literature these ceremonies and rituals may also be referred to as "witchcraft" or "black magic." However, according to Cookson, "black magic in itself does not denote harm or wrongdoing to others, rather describe 'black' as considered to the Arabic root word FHM, charcoal, black, and wisdom. Black is thus the color of hidden knowledge. Magic is to ascend by willed focus and direction." (Id. ¶ 53) (quoting Ford, Michael, <u>Liber HVHI</u>).
- Cookson sincerely believes that these rituals and ceremonies are necessary and important parts of his religious belief and practice. They hold the same value to Cookson as church services, bible studies, or Christmas mass holds for Christian inmates. (Id. ¶ 54.)

### b. *Grievance process*

Cookson sets forth a series of paragraphs that relate to the formal and informal grievances and appeal processes, focusing on the inadequacy of what was revealed to him during the processes and the failure to ask him questions about his own religious beliefs and his practices and rituals. Those asserted "facts" are set forth in the Cookson Declaration at ¶¶ 55 – 66, 68 – 80, 86. Basically Cookson asserts that the Commissioner relied upon the tenets of Satanism as put forth by the group in 2002 and his own research, rather than engaging in an interactive process with Cookson during the grievance process. If he had been asked, Cookson could have revealed his personal repudiation of some of the aspects of Satanism that Magnusson felt were contrary to institutional security.

Cookson also has a number of paragraphs detailing the information he uncovered during discovery while this case has been pending. (Cookson Decl. ¶¶ 81- 91.) Cookson notes that

Magnusson maintains that there is no discriminatory purpose in not recognizing Satanism as a religion.  Cookson points out that groups such as Catholics, Protestants, Jehovah Witnesses, Pentecostals, Pagans, Native Americans, Wiccans, Muslims, Buddhists, Odinists, as well as secular groups like the NAACP, Longtimers, Veterans, and Jaycees, are provided a meeting place for group studies and rituals as well as a secure and safe storage locker.  (Id. ¶¶ 88, 96.) The ritual items that Cookson seeks have all been approved for pagan and Wiccan groups; Cookson is not asking for any special treatment or extra benefits.  (Id. ¶ 96.)  In his answers to interrogatories, the Commissioner claims that he denied Cookson's grievance based on Cookson's own request to practice Satanism, with Cookson not differentiating any particular sect of Satanism or different practice.  However, Cookson was never given the opportunity to clarify any of their concerns pertaining to Cookson's religious beliefs or the practice of Satanism.  If he had been given this opportunity he could have explained that his sincerely held religious beliefs do not reflect those provided by previous inmates who wanted to practice the teachings of the "Satanic Bible" or the LaVey brand of Satanism.  (Id. ¶ 91.)  Cookson acknowledges  the fact that all mail and publications coming into MSP are reviewed by mail room staff or the media review officer to determine compliance with the Department Mail Policy, hence in Cookson's opinion there is no mail or publication issue in this lawsuit.  (Id. at 97.)

**B.  The Contours of Cookson's Claims for Injunctive Relief under RPUILA, The First Amendment, and the Fourteenth Amendment**

On Page 5 of his responsive memorandum Cookson notes that he voluntarily withdraws all his claims under the Eighth Amendment of the United States Constitution and under the Constitution of the State of Maine as well as any request for monetary relief.  (Resp. Mem. at 5,

Doc. No. 16; Cookson Decl. ¶ 14.)  In that pleading he states that he would voluntarily withdraw

this lawsuit should the new commissioner agree to the following:

> a. Recognize Satanism as a religion at MSP.
> b. Allow at MSP a scheduled time (a couple hours once a week) and place for
> group worship and studies for inmates practicing Satanism.
> c. Provide a secure locker to store religious materials used for group worship and
> studies.

(Cookson Decl. ¶ 95.)

Cookson is expressly not challenging the policy governing the treatment of his request to

practice his 'religion' but, rather, the application of that policy to Cookson.  For instance, in

Paragraph 61 of his declaration Cookson refers to his second level grievance:  "I was very clear

in stating that Satanism 'could be practiced in this facility <u>without violating any of the rules or

guidelines of the Facility</u>- just like the other recognized religions here."  (Cookson Decl. ¶

61)(emphasis added).  He faults Magnusson (and now Ponte) for personally relying on a third

level grievance in a previous case to resolve Cookson's grievance.  (<u>Id.</u> ¶ 65.)

In his response memorandum to the amended summary judgment record Cookson argues:

"The focus of Satanism is not hatred or bias as so many unknowingly assume, but personal

growth and development free of religious oppression."  (Resp. Mem. at 2-3, Doc. No. 31.)  One

passage of Cookson's memorandum states:

> Seeking gratification by the so called seven deadly sins is a positive
> message about self-improvement. For example, greed will help make you more
> industrious so you can earn more, pride will drive you to take care of your health,
> envy will motivate you to work hard to advance or get the things you want, anger
> will help you protect yourself in times of danger, gluttony is when you eat for
> pleasure or simply have more than you need to survive, lust helps perpetuate the
> human race so we don't go extinct, and sloth is if you don't feel like getting out of
> bed in the morning—but the other sins should soon get you out of bed.

(<u>Id.</u> at 6-7.)

One component of the analysis common to all three of Cookson's claims is the question of whether Satanism is a religion. Cookson argues that Satanism answers fundamental questions about life, death, purpose, and the overall conception of the universe. He believes that it teaches him about his immortal substance. With respect to Cookson's First Amendment free exercise claim the United States Supreme Court observed in <u>Thomas v. Review Board of Indiana Employment Security Division</u>,

> The determination of what is a "religious" belief or practice is more often than not a difficult and delicate task, as the division in the Indiana Supreme Court attests. However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

450 U.S. 707, 714 (1981) (footnote omitted). "Courts generally make two primary inquiries to determine whether a given belief is religious for First Amendment purposes" the Seventh Circuit Court noted in <u>Childs v. Duckworth</u>, 705 F.2d 915, 921 n.7 (7th Cir. 1983). "They examine whether (1) a given belief is "sincerely" and "meaningfully" held by the claimant and (2) it "occupies a place in the life of its possessor parallel to that filled by the Orthodox belief in God." <u>Id.</u> (citations omitted).

With respect to the sincerity of Cookson's belief in Satanism, courts have routinely held that "whether an individual is sincere in his beliefs is a factual one." <u>Howard v. United States,</u> 864 F. Supp. 1019, 1024 (D.Colo., 1994) (citing <u>LaFevers v. Saffle</u>, 936 F.2d 1117, 1119 (10th Cir.1991) citing <u>Frazee v. Illinois Dept. of Employment Sec.</u>, 489 U.S. 829, 832–33 (1989)). <u>Cutter v. Wilkinson</u> addressed these concerns vis-à-vis a RLUIPA claim that involved Satanism, noting that the prison officials stipulated that petitioners were members of bona fide religions

and that they were sincere in their beliefs.  544 U.S. 709, 712 -13 (2005)(citing Gerhardt v. Lazaroff, 221 F.Supp.2d 827, 833 (S.D. Ohio  2002)). The Supreme Court noted:

> Although RLUIPA bars inquiry into whether a particular belief or practice is "central" to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity. Cf. Gillette v. United States, 401 U.S. 437, 457 (1971) ("'[T]he "truth" of a belief is not open to question'; rather, the question is whether the objector's beliefs are 'truly held.' " (quoting United States v. Seeger, 380 U.S. 163, 185 (1965).

Id. at 725 n.13 (2005).

 In this case I do not perceive the need to make a firm determination of whether or not Cookson's effervescent brand of Satanism qualifies as a religion under the applicable case law or whether his beliefs are sincerely held.  See Childs, 705 F.2d at 919 (one day trial) (footnote omitted)  ("As previously indicated, we need not reach the question of whether satanism, or more specifically Childs' belief, is a religion, although the prison officials and the district court decided it was not."); Howard, 864 F.Supp. at1024.("Warden Perrill acknowledged that the Bureau of Prisons treats Satanism as a religion and neither the Government nor the plaintiff raise the issue in the briefs. I will therefore assume on this record that plaintiff's beliefs are conceded to be religious in nature.") (record citation omitted).  It seems to me that on the record as it currently exists, Cookson has at least created a genuine issue of material fact as to whether his brand of Satanism qualifies as a religious belief and whether or not his beliefs are sincerely held. I will instead turn to the legal merits of the three claims asserted by Cookson, assuming that his Satanism is a religion and that his beliefs are sincerely held.

*1. **RLUIPA Claim***

Section 3 of RLUIPA provides: "No government shall impose a substantial burden on the religious exercise" of an institutionalized person unless the defendant demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000cc−1(a). In <u>Spratt v. Rhode Island Dep't of Corr.</u> the First Circuit summarized the elements of such a claim and articulated the shifting burden,

> a claim under RLUIPA includes four elements. On the first two elements, (1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial, the plaintiff bears the burden of proof. Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest.

482 F.3d 33, 38 (1ˢᵗ Cir. 2007) (internal citations omitted).

The Commissioner argues that there is no substantial burden on Cookson's religious exercise. It argues: "Cookson failed to establish that he had a truly and sincerely held religious belief or practice that was substantially burdened." (Mot. Summ. J. at 4.) He continues:

> Cookson never specified what he was actually practicing since there are currently no Satanic religious services or publications allowed in the prison, and they have not been allowed since Cookson's tenure there. …
> Moreover, Cookson is hard-pressed to claim that he was required to "modify" any of his behavior or forced to "abandon" the tenets of his religion. He never engaged in group Satanic services or had access to The Satanic Bible at the prison, and he became a Satanist after he entered the prison. He was not forced to modify or abandon anything. Whatever his "practice" of Satanism constituted prior to his request for space in the activities room was not burdened and there is no DOC ban on what Cookson is allowed to believe. Cookson was not precluded from continuing his current practice of Satanism. Cookson vaguely "attest[ed] that Satanists need ceremony and ritual."

(Id.)[6]

RPUILA provides "The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C.  § 2000cc-5 (7)(A).

As for the substantial burden inquiry, Cookson writes:

> It should be obvious that denying an individual to engage in group worship and practice of their religion places a substantial burden on them. … Plaintiff has demonstrated through his Declaration that ceremonies and rituals [are] an important part of his religious beliefs and practice.  A ban on him performing or engaging in group worship places a substantial burden on the plaintiff.  Simply put, my religious and spiritual needs are incomplete.  A comparable sample would be MDOC banning all church services, bible study groups  for all church services, bible study groups for Christian inmates, preventing Muslim inmates from participating [in] Jumah (Friday prayers) or asking the Wiccans, Pagan and Odinists to perform their religious ceremonies in their cells.

(Pl.'s Opp'n Mot. Summ. J. at 17-18.)

With regards to his argument for accommodation/least restrictive means, Cookson opines:  "Although it may seem that allowing Satanism at the facility would open the door for followers of LaVey to engage in the so called dangerous practices of Satanism, a solution could have been to allow only pre-scripted ceremonies, approved by the prison officials, then performed without using any LaVey material."  (Pl.'s Opp'n  2d Mot. Summ. J. at 3.)  This, in Cookson's view, would have been an appropriate modification under the Prison Religious Policy 24.3 Procedure A.8.  (Id.)  Cookson urges that there were no attempts to seek a least restrictive means available.  (Id. at 4.)  He points to his declaration paragraphs that state that Magnusson admits that no alternative means were employed or considered during his grievance process and

_____

[6]     The defendant keeps referring to a lack of record evidence to support Cookson's allegations.  It is not clear to me how this record evidence would come before the court prior to the filing of the motion for summary judgment.

16

there was no consideration as to whether a less restrictive policy was feasible rather than a

blanket ban. (Pl.'s Opp'n Mot. Summ. J. at 15.)

### 2. First Amendment

#### a. Free Exercise claim

> The Free Exercise Clause commits government itself to religious
> tolerance, and upon even slight suspicion that proposals for state intervention
> stem from animosity to religion or distrust of its practices, all officials must pause
> to remember their own high duty to the Constitution and to the rights it secures.
> Those in office must be resolute in resisting importunate demands and must
> ensure that the sole reasons for imposing the burdens of law and regulation are
> secular. Legislators may not devise mechanisms, overt or disguised, designed to
> persecute or oppress a religion or its practices.

Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547 (1993).

The free exercise analysis is similar to that undertaken in RLUIPA challenges. Drawing

on its own precedents, O'Lone v. Shabazz, a free exercise of religion challenge in the prison

context, summarized the framework of this inquiry. 482 U.S. 342, 348-50 (1987). While

acknowledging that prisoners do not forfeit all constitutional protections by reason of their

incarceration, the Court embraced the Turner v. Safley, 482 U.S. 78,89 (1987) reasonableness

test when prison regulations impinge on an inmate's First Amendment religious freedom right.

Turner sets forth a four prong inquiry to determine if the policy in question is constitutionally

reasonable: (1) there must be a "valid, rational connection" between the prison regulation and

the legitimate governmental interest put forward to justify it; (2) there must be valid alternative

means of exercising the rights that remain open to prison inmates; (3) the impact accommodation

of the asserted constitutional right will have on guards and other inmates, and on the allocation

of prison resources generally; and, finally (4) the absence of alternatives. Id. at 89-91.

17

In <u>Childs</u> the Seventh Circuit explained apropos the assertion by the plaintiff of

his right to practice Satanism in a group setting,

> [O]ur concern, assuming his belief is a religion, is whether the prison restrictions were such that they unlawfully deprived Childs of his First Amendment right to the free exercise of his religion. In this connection we are mindful that while freedom to believe is absolute, the exercise of religion is not, <u>Cantwell v. Connecticut</u>, 310 U.S. 296 (1940); <u>Reynolds v. United States</u>, 98 U.S. 145 (1878); <u>Sharp v. Sigler</u>, 408 F.2d 966 (8th Cir.1968); <u>United States v. Kuch</u>, 288 F.Supp. 439 (D.D.C.1968), and that prison officials may legitimately impose certain restrictions on the practice of religion in prison, including the right of association, which would be unconstitutional if imposed outside the prison. <u>Bell v. Wolfish</u>, 441 U.S. 520, 545–46 (1979); <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974); <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).

705 F.2d at 919-20; <u>see</u> <u>also</u> <u>Hendrickson v. Caruso</u>, No. 1:07-cv-304, 2008 WL 623788,

7 -8  (W.D. Mich. Mar. 24, 2008).

### b. *Establishment of religion claim*

Cookson does include in his pleadings an assertion that the policy in question violates the

First Amendment prohibition against the government's establishment of religion.  However, his

theory here is sorely underdeveloped.  The Supreme Court's <u>Cutter</u> held that RLUIPA, which is

outwardly more protective of the rights identified by Cookson, does not violate the establishment

clause of the United States Constitution.  544 U.S. 709.  I am satisfied that Cookson's First

Amendment challenge is intended as a free exercise challenge and that the summary judgment

record does not support an establishment clause violation on the part of the prison authorities.

### 3. *Fourteenth Amendment Equal Protection Claim*

It is Cookson's contention that the equal protection guarantee of the Fourteenth

Amendment "requires prison officials to treat religion in an even handed manner."  (Pl's Opp'n

Mot. Summ. J. at 16.)  In <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, the Supreme

Court addressed an equal protection claim in the prison setting, explaining,

within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused. That is surely not the case here. There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.

433 U.S. 119, 136 (1977).

The First Circuit's recent <u>Kuperman v. Wrenn</u> summarized:

To establish an equal protection violation, a plaintiff must introduce sufficient evidence from which a jury reasonably could conclude that, compared with others similarly situated, the plaintiff was treated differently because of an improper consideration, such as his religion. Equal protection does not, however, require prison staff to treat all inmate groups the same when differentiation is necessary to avoid a threat to prison security. <u>See, e.g.,</u> <u>Jones v. N.C. Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 136 (1977).

645 F.3d 69, 77 -78 (1st Cir. 2011) (internal citations omitted).

### C. Resolution of Cookson's Free Exercise, RLUIPA, and Equal Protection Claims

Cookson makes it clear that he is "not a member of the Church of Satan, or any particular sect or splinter group of that church." (Cookson Decl. ¶ 35.) He states: "I sincerely believe that as a Satanist, [he is] not required to follow any one particular church's teaching or dogma." <u>Id.</u> ¶ 36.) Cookson does not identify any other inmates at the Maine State Prison who want to practice his free-flowing form of Satanism. <u>See</u> <u>Childs</u>, 705 F.2d at 921(footnote omitted) ("Moreover, the record reveals that Childs was the only inmate making requests for satanic meetings. There is no requirement for the authorities to provide Childs with a podium from which to propagate his individual beliefs. <u>See</u> <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. at 129. As stated by the Supreme Court in <u>Cruz v. Beto</u>: "A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain,

priest, or minister be provided without regard to the extent of the demand." 405 U.S. at 322 n. 2.").

On a related note, the defendant argues that just because Cookson is representing that he will only practice a non-violent version of Satanism, it does not guarantee that others involved in the group education and ceremony will also so limit their practice. Cookson himself admits that, "one's beliefs need not by shared by all of its members or be part of any orthodox or any official interpretation of church doctrine." (Pl.'s Opp'n Mot. Summ. J. at 12) (citing Thomas, 450 U.S. at 715-16). I acknowledge Cookson's argument that he was not given the opportunity to explain his variety of Satanism in comparison to the 2002 group who grieved who professed hate for their adversaries by means of extreme violence, the gratification of the deadly sins, and rituals aimed at others. Cookson spends a great deal of space in his declaration explaining how he was not provided with adequate information and history during his grievance and grievance appeal process. While these statements might have some bearing if the defendant was pressing a defense of failure to exhaust, they do not support a stand-alone 42 U.S.C. § 1983 claim. See Lamon v. Junious, No. 1:09-cv-00484-GSA PC, 2009 WL 3248173, *4 -5 (E.D. Cal. Oct. 8, 2009). The merits of Cookson's constitutional and RLUIPA claim are now before the court and have been reviewed on the merits as set forth in the summary judgment record premised on the civil discovery that Cookson received from the defendant.

I note that I do not agree with the defendant that the fact that Cookson did not practice Satanism in a group setting prior to entering the prison runs against his claim; it is quite evident that incarcerated individuals may choose to follow a new religion during the period of their confinement. The argument that Cookson has never before practiced Satanism with other

inmates in group ceremony or teaching at the MSP does not gain traction either given the blanket ban decision following the 2002 grievance.

On the other hand, Cookson's insistence that other recognized religious groups such as the Pagans and the Wicca are allowed to use the same ritual items as requested by Cookson does not tip the balance in Cookson's favor. The Commissioner's decision to deny Cookson's grievance did not ride on his request for these ritual items; the defendant reiterates time and time again that the decision was out of a concern for institutional safety due to the espousal of vengeance and violence towards others. The Commissioner relied upon his understanding of the basic tenets of Satanism. Cookson does not dispute that those tenets are part of the religion, he simply reiterates that he doesn't personally subscribe to all the major tenets of the religion.

Cookson insists that the Commissioner never considered alternatives to the ban on group ceremonies so as to accommodate his request. He suggests that the prison had other tools at its disposal such as limiting the group to a pre-scripted ceremony or the imposition of disciplinary sanctions should members of the group run afoul of the rules because of their Satanist beliefs. O'Lone, addressing a challenge by Islamist prisoners to a work policy that resulted in them missing the Friday Jumu'ah service, made it clear that there is not a separate burden on prison officials to set up and shoot down conceivable alternative methods to accommodate a free exercise claim. 482 U.S. at 350. In addition, "courts do not require an actual breach of security before upholding a regulation designed to prevent it." Kuperman, 645 F.3d at 75 (citing Turner, 482 U.S. at 89 and O'Lone, 482 U.S. at 349). This comes back around to the Commissioner's position that an outright ban on the group practice of Satanism is necessary for the safety, security, and orderly management of the Maine State Prison because of the violent nature and central tenets of Satanism.

For purposes of this recommended decision I am assuming that Cookson's religious exercise has been substantially burdened by the denial of the right to convene group study, practice, and rituals. I am cognizant of the difference between RLUIPA's compelling governmental interest test and the First Amendment's <u>Turner</u> analysis. The RLUIPA is more favorable to Cookson and he has not carried his summary judgment burden of establishing a reasonable inference that the Commissioner's policy of not allowing the group observance of Satanism is not compelling under the circumstances. I highlight that Cookson professes that his form of Satanism is not a threat to institutional safety and security, but there is absolutely no evidence in this record that those unknown inmates that might join Cookson in his group's Satanic activities would follow his disavowal of vengeance and violence. Indeed Cookson states that his faith is free-form and that his beliefs need not be shared by all the members of his group. (Pl.'s Opp'n Mot. Summ. J. ¶ 8.) He writes that his philosophy is taken from the teachings of the Temple of Set which advocates not following one system blindly but to search out and find the right magical system for the individual. (Pl.'s Opp'n 2d Mot. Summ. J. at 2.) With respect to the equal protection claim, the defendant has advanced evidence that the differentiation between Satanism and other religions at MSP is necessary to avoid the threat to prison security.[7] If you accept the Commissioner's finding that the practice of Satanism, as commonly understood, poses an institutional danger to the security of the prison, then Cookson's request to convene group rituals based, however loosely, on the religious practice of Satanism could properly be denied.

---

[7] In the answers to Cookson's second set of interrogatories, the defendant indicates that the decision to allow Odinism turned on the requirement that the group refrain from practicing any form of Satanism, neo-Satanism, or Nazism. (Doc. No. 31-1 at 1.)

Cookson remains free to practice his individual religion.  He has received literature which he has adapted to his religious practice without running afoul of prison mail policy or library rules.  Even under the demanding standard of RLUIPA the commissioner has shown a compelling governmental interest in maintaining prison security.  If one assumes that the failure to provide a place for group rituals is a substantial burden on Cookson's brand of Satanism, that burden is justified given the safety concerns.  Cookson's "least restrictive" alternative of allowing only prison approved ritual scripts and ideology, would actually run a greater risk of prison officials limiting free exercise and belief for those who claimed to be Satanists.  There are no reasonable alternatives, other than the existing alternative which allows for individual beliefs and education through reading.

## CONCLUSION

As explained above, I recommend that the motion for summary judgment be granted.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within twenty-eight  (28) days of being served with a copy thereof.  A responsive memorandum shall be filed within twenty-eight (28) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 4, 2012